# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of:<br>*COURTYARD*<br>Common ~~hallway~~ outside N88 W14822 Main Street,<br>Apartment #B-3, Menomonee Falls, Wisconsin, more fully<br>described in Attachment A. | )<br>)<br>)  Case No. ____20m 801____<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*COURTYARD*

Common ~~hallway~~ outside N88 W14822 Main Street, Apartment #B-3, Menomonee Falls, Wisconsin, as more fully described in Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

- ■ evidence of a crime;
- ■ contraband, fruits of crime, or other items illegally possessed;
- ■ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:  Title 21, United States Code, Sections 841(a)(1) and 846

The application is based on these facts: See attached affidavit.

- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Tyler Fink, USPIS Postal Inspector
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _January 6, 2020_

_____
*Judge's signature*

City and State: <u>Milwaukee, Wisconsin</u>          <u>William E. Callahan, Jr.</u>, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Tyler Fink, being first duly sworn, hereby depose and state as follows:

## I. BACKGROUND

1. I am a Postal Inspector with the United States Postal Inspection Service (USPIS). I have been employed by the USPIS since February 2017.

2. The USPIS is the primary investigative arm of the United States Postal Service (USPS) and is charged under Title 18, United States Code, 3061 with the enforcement of laws governing the use and movement of the United States Mail, including, but not limited to, the misuse and fraudulent schemes involving the mail, crimes relating to mail fraud, identity theft, and narcotics trafficking involving the United States Mail.

3. I am currently assigned to the Milwaukee Office multi-functional team as well as the High Intensity Drug Trafficking Area (HIDTA) Interdiction Initiative Task Force. The multi-function team investigates mail theft, fraud, the theft of Postal property, prohibited mailings, controlled substances, and other matters related to the Postal Service. I have received advanced training by the USPIS in the investigation of controlled substances or proceeds/payments being transported through the United States. The Milwaukee Field Office's multi-function team has intercepted numerous parcels, which were found to contain narcotics or proceeds of narcotics trafficking and other criminal activity. Prior to my employment with the USPIS, I was employed by the City of Creve Coeur, Missouri Police Department in the Patrol Division for approximately three years as a Police Officer. While working as a Police Officer, I received extensive training in narcotics investigations.

4. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code, Sections 841(a)(1) and 846 (possession with intent to distribute a controlled substance and conspiracy to possess with intent to distribute a controlled substance), and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including one using

1

wiretaps. More specifically, my training and experience includes the following:

    a.  I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

    b.  I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

    c.  I have participated in several search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

    d.  I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

    e.  I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

    f.  I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

    g.  I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

    h.  I have assisted in court authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations;

    i.  I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate

2

drug trafficking; and

j.   I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

5.   I have served as the affiant on over 60 warrants in federal court. Based on my training received at the USPIS Career Development Unit, personal experience, on the job training, and working with other Postal Inspectors and Wisconsin HIDTA drug task force officers, I know narcotics, drugs, paraphernalia, controlled substances, and moneys associated with the sale of narcotics, drugs, and controlled substances are sent through the USPS system, and I am familiar with many of the methods used by individuals who attempt to use the USPS to illegally distribute controlled substances.

6.   This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

7.   Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation.

8.   Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause.

9.   For the reasons discussed herein, there is probable cause to believe that the premise located in the Eastern District of Wisconsin, more fully described in Attachment A, are items that constitute evidence of illegal narcotics possession and/or distribution, in violation of Title 21, United States Code, Sections 841 and 846.

3

## II.    THE DRUG DETECTION CANINE

10.    I know "Drug Detection Canines" are trained to detect the odor of controlled substances; that these substances include marijuana, cocaine, heroin, methamphetamine, as well as other dangerous drugs due to chemical processing similarities; that upon location of the odor of these controlled substances, the dog's behavior will change; that the dog is trained to come to a final response of biting and/or scratching, or sitting and staring, at the source of the odor; that this final response is called an **"Alert;"** furthermore, this final response or **"Alert"** may also indicate items recently contaminated with, or associated with, the odor of one or more of the controlled substances;

11.    I know when a dog is trained to detect a substance, it learns to discriminate the odor vapor of that substance from other odors in the environment by reacting to the compound(s) that best help it earn reinforcement from the drug detection canine handler; that with sufficient training, the compound(s) whose detection most often results in reinforcement becomes the "odor detection signature";

### FLORIDA -v- JARDINES

12.    I am also aware of the recent Supreme Court decision in *Florida –v- Jardines* that a police officer's use of a trained narcotics detection canine at the front door of a home to reveal details inside that home, which the officer is unable to discover using the officer's ordinary powers of perception without a physical intrusion into the home, is a Fourth Amendment search requiring a warrant based on probable cause; that without a warrant a dog sniff was a governmental intrusion into the curtilage of a home and constitutes a search within the meaning of the Fourth Amendment because special protection is offered to the home and that the police violated *Jardines'* expectation of privacy by unlawfully entering his property without a warrant based on probable cause;

13.    I am further aware that the United States Supreme Court subsequently also held that the government's use of trained police dogs to investigation a home and/or apartment, and its immediate surroundings, is a "search" within the meaning of the Fourth Amendment; that in so holding, the Court relied on the special protections

4

afforded to the home and the apartment dweller and the area immediately surrounding their home and/or their apartment, that is, the curtilage; that the Court went on to explain that while the knocker on the front door is treated as an invitation or license to attempt entry justifying ingress to the home by solicitors, hawkers and peddlers of all kinds, it does not extend to a trained police dog to explore the area around the home in hopes of discovering incriminating evidence.

## III. PROBABLE CAUSE

14. In September of 2018, case agents initiated an investigation into the Jose GONZALEZ-COLLADO Drug Trafficking Organization (DTO). As part of the investigation, case agents have interviewed several confidential sources and have utilized one under cover law enforcement officer to complete 15 controlled purchases of cocaine and heroin from GONZALEZ-COLLADO or one of his associates. As a result of the intelligence provided by the confidential sources and the controlled purchases, along with information obtained from other law enforcement officers, case agents have learned that GONZALEZ-COLLADO obtains kilogram amounts of cocaine via the United States Postal Service ("USPS") from several known and unknown sources of supply in Puerto Rico, and is a leader of a large-scale cocaine and heroin distribution network operating in the Milwaukee metropolitan area.

15. In October of 2018, case agents interviewed a confidential source (hereinafter CS-1). CS-1 stated GONZALEZ-COLLADO distributes large quantities of cocaine in Milwaukee, Wisconsin and the surround areas. CS-1 introduced Eric ROSA, a member of the GONZALEZ-COLLADO DTO, to an Undercover DEA Task Force Officer (TFO) herein referred to as "UC." During undercover contact with ROSA, the UC has purchased large quantities of heroin and cocaine from ROSA and ROSA'S sources of supply to include GONZALEZ-COLLADO.

16. CS-1 cooperated with law enforcement from approximately September 2018 to present. CS-1 cooperated in exchange for consideration on a traffic related/Operating While Intoxicated offense. CS-1 has never been paid any sums of money for CS-1's cooperation with law enforcement. Thus far, the information provided

5

by CS-1 has proven to be reliable and has been corroborated by, among other things, physical surveillance activities, USPS postal records, controlled buys and other confidential source information. According to law enforcement databases, CS-1 has been convicted of: Operating While Intoxicated and Operating After Revocation.

17.     According to a confidential source (hereinafter CS-2) GONZALEZ-COLLADO distributes kilogram level quantities of cocaine and heroin to customers in Milwaukee, Wisconsin. CS-2 further indicated that GONZALEZ-COLLADO obtains the cocaine, via the USPS, from a known and unknown source of supply based out of the U.S. Territory of Puerto Rico. Search warrants for USPS parcels, physical surveillance and information provided by CS-2 has shown that GONZALEZ-COLLADO and other members of the DTO will mail parcels, containing drug proceeds, to the source(s) of supply in Puerto Rico, via the USPS. GONZALEZ-COLLADO has prior arrests and convictions through the U.S. Territory of Puerto Rico for Felony Possession of Narcotics with Intent to Deliver.

18.     In October thru December 2018, Wisconsin Division of Criminal Investigation (DCI) Special Agent (SA) Todd Higgins and Homeland Security Investigations (HSI) Special Agent (SA) Jeremy Dorn spoke with CS-2, who provided information that was reliable given that he/she made statements both against his/her penal interest and later corroborated by other information gathered during the course of the investigation. CS-2 had known GONZALEZ-COLLADO for several months and, along with several of GONZALEZ-COLLADO's associates, shared an interest in working on automobiles. Given the CS-2's close association with GONZALEZ-COLLADO and his associates, CS-2 became privy to the illicit activity in which they engaged. Specifically, CS-2 said GONZALEZ-COLLADO supervised a drug-trafficking organization in the greater Milwaukee area. According to CS-2, GONZALEZ-COLLADO had cocaine sent, via USPS, from Puerto Rico to Milwaukee, Wisconsin.     On several occasions GONZALEZ-COLLADO mentioned to CS-2 that GONZALEZ-COLLADO's drug source-of-supply resided in Puerto Rico (hereinafter the Puerto Rican drug source).

GONZALEZ-COLLADO had numerous associates who agreed to receive the cocaine, which would be delivered to their home addresses in the Milwaukee area, via the USPS.

19.     In October 2018, law enforcement encountered CS-2 at CS-2's residence located in the south side of Milwaukee, Wisconsin. CS-2 was identified as a co-conspirator in the Milwaukee based drug trafficking organization (DTO) which included GONZALEZ-COLLADO and ROSA. CS-2 admitted to receiving a parcel on behalf of GONZALEZ-COLLADO, which CS-2 stated contained contraband. The parcel contained approximately 3,063 grams of field-tested cocaine, discovered by case agents during a search warrant and seizure. CS-2 was subsequently arrested by law enforcement and interviewed by case agents. CS-2 informed law enforcement that on the day of the search warrant and CS-2's arrest, CS-2 was with GONZALEZ-COLLADO and Julio RIVERA-RAMIREZ, a.k.a. "Macho." CS-2 stated that RIVERA-RAMIREZ serves as an enforcer for GONZALEZ-COLLADO, and the "muscle." CS-2 was contacted by GONZALEZ-COLLADO who was aware that law enforcement had executed a search warrant at CS-2's residence. Prior to CS-2's surrender to police, CS-2 met with GONZALEZ-COLLADO and RIVERA-RAMIREZ at Stadium Self Storage located at 4000 W. Burnham St., Milwaukee, Wisconsin. CS-2 stated GONZALEZ-COLLADO rented storage space at that facility and used the storage rental as a narcotics "stash" location. RIVERA-RAMIREZ offered to go to the area of CS-2's residence (search warrant location) and RIVERA-RAMIREZ stated RIVERA-RAMIREZ would fire his weapon in the area in an attempt to distract police so cocaine and contraband could be removed from CS-2's garage. CS-2 explained that GONZALEZ-COLLADO lived across the alley from CS-2, and that GONZAELZ-COLLADO had full access to CS-2's garage. CS-2 stated that GONZALEZ-COLLADO stored illegal narcotics and firearms in the garage. I know during the execution of the search warrant at CS-2's residence, law enforcement did locate numerous firearms and approximately 350 grams of field-tested cocaine. CS-2 stated GONZALEZ-COLLADO rented storage space at a storage facility in Milwaukee County and used the storage rental as a narcotics "stash" location.

20.     CS-2 actively cooperated with law enforcement from approximately October 2018 to January 2019. CS-2 is currently utilized for information only and CS-2 has expressed fears that CS-2's life would be endangered if the DTO discovered CS-2's cooperation with law enforcement. CS-2 stated that GONZALEZ-COLLADO and other members of the DTO have ceased communication with CS-2 as a precaution because of CS-2's arrest. CS-2 cooperated in exchange for consideration of leniency on charges for Possession of Cocaine with Intent to Deliver. CS-2 has never been paid any sums of money for CS-2's cooperation with law enforcement. Thus far, the information provided by CS-2 has proven to be reliable and has been corroborated by, among other things, physical surveillance activities, USPS postal records, search warrants, controlled drug buys, undercover recordings and other confidential source information. According to law enforcement databases, CS-2 has been convicted of Armed Robbery and Possession of a Controlled Substance.

21.     On November 6, 2018, case agents accompanied CS-2 to Stadium Self Storage where CS-2 identified the location of the storage space rented by GONZALEZ-COLLADO. During that time, law enforcement observed a red Toyota Corolla bearing Wisconsin registration 746XYP, parked along the fence line, in the direct area of GONZALEZ-COLLADO's storage space. That same red Toyota was previously observed by case agents conducting surveillance at 1330 South 22nd Street, Milwaukee, Wisconsin, as part of a search warrant, which resulted in the seizure of several kilograms of cocaine. The red Toyota lists to Sonia RODRIGUEZ, the mother of Vladimir RODRIGUEZ-RODRIGUEZ and Hector Yamil RODRIGUEZ-RODRIGUEZ. Both RODRIGUEZ-RODRIGUEZ brothers distribute narcotics alongside GONZALEZ-COLLADO and are part of the DTO.

22.     During the course of the investigation, case agents also received cooperation from another confidential source (hereinafter CS-3). CS-3 agreed to conduct a controlled purchases of narcotics from MARTINEZ-PELLOT with the expectation that s/he would receive lenient treatment regarding pending state charges. Case agents believe the confidential source is credible and reliable because the confidential source

8

made statements against the confidential source's penal interest. These statements were later corroborated by other information gathered during the course of the investigation. CS-3 has a 2017 arrest in Milwaukee County for possession with intent to deliver cocaine and possession with intent to deliver heroin. In addition, CS-3 has a 2018 arrest in Milwaukee County for possession with intent to deliver cocaine, possession with intent to deliver heroin, use of a dangerous weapon, bail jumping and obstructing an officer.

### Controlled Purchases Involving MARTINEZ-PELLOT

23.     Andros MARTINEZ-PELLOT is believed to reside at **N88 W14822 Main Street, Apartment B3, Menomonee Falls, Wisconsin**. This has been confirmed by records obtained through this investigation and surveillance. The investigation to date has revealed that MARTINEZ-PELLOT is a mid-level distributor of cocaine and is supplied by at least one member of the Jose GONZALEZ-COLLADO Drug Trafficking Organization (DTO).

24.     In March of 2019, Milwaukee Police Officer Christopher Conway conducted a narcotic trafficking investigation into MARTINEZ-PELLOT. Based on his investigation, he identified areas of Milwaukee MARTINEZ-PELLOT frequented, one of which was National Muffler at 5740 West Fond du Lac Avenue in Milwaukee, Wisconsin, as well as Russ Darrow Auto at 7676 North 76th Street in Milwaukee, Wisconsin.

25.     Officer Conway conducted a spot check at Russ Darrow and observed a red Chevrolet pickup truck (Wisconsin plate: NR6908) parked there. A query revealed that the plate listed to MARTINEZ-PELLOT at 9711 West Greenwood Terrance in Milwaukee, Wisconsin. MARTINEZ-PELLOT's prior address.

26.     On May 2, 2019, Officer Conway and other law enforcement officers conducted a garbage search at 9711 West Greenwood Terrance. During the search, he recovered several documents, one of which contained the following information: Andros Martinez, 939-202-6386, 9711 W. Greenwood Ter, Milwaukee, Wisconsin 53224. A second document recovered listed the name of Domonique MARTINEZ [who has a maiden name of BARLEY and is the wife of MARTINEZ-PELLOT], 2561 W. Decorah Rd. in West Bend, Wisconsin, (262) 957-4281.

9

27.     On May 30, 2019, Officer Conway met with CS-3 regarding MARTINEZ-PELLOT. CS-3 had previously provided information regarding MARTINEZ-PELLOT's drug trafficking activities. CS-3 had purchased cocaine from MARTINEZ-PELLOT over three (3) times in the past for a quantity around ½ ounce on each of the occasions. CS-3 stated that MARTINEZ-PELLOT sells an ounce of cocaine for $1,100.00. CS-3 further stated that MARTINEZ-PELLOT drove a red pick-up truck and goes by a nickname of "Dro." Additionally, CS-3 identified one of MARTINEZ-PELLOT's cellular phone numbers as 939-202-6386 – with a prefix belonging to Puerto Rico.

28.     On June 11, 2019, Officer Conway and other law enforcement met with CS-3. The purpose of this meeting was to conduct a controlled purchase of cocaine from MARTINEZ-PELLOT.[1] CS-3 advised Officer Conway that MARTINEZ-PELLOT had previously provided the cellular phone number of (262) 770-9667 to be utilized for all drug related transactions. At 1:45 p.m., MARTINEZ-PELLOT called CS-3 to discuss where to meet in order for CS-3 to purchase cocaine. Both agreed to meet at the Cousin's Restaurant at 7140 North 76th Street in Milwaukee, Wisconsin. At approximately 2:25 p.m., MARTINEZ-PELLOT arrived at Cousin's restaurant while driving a white motor scooter (Wisconsin plate: 274HD). A query with the Wisconsin Department of Transportation revealed that the scooter lists to Peter E. Barley of 6151 N. 116th Street in Milwaukee. The last name BARLEY is consistent with MARTINEZ-PELLOT's spouse's maiden name. In exchange for $2,200.00 in U.S. currency provided to CS-3 by law enforcement, MARTINEZ-PELLOT provided CS-3 with two clear plastic bags containing suspected cocaine. Both MARTINEZ-PELLOT and CS-3 parted company. Law Enforcement conducted surveillance of MARTINEZ-PELLOT who then drove to Russ Darrow at 7676 North 76th Street after the transaction. The suspected cocaine was field tested by Officer Conway, which resulted in a positive test for cocaine, weighing approximately 55.61 grams.

---

[1] All four controlled purchases of cocaine from MARTINEZ-PELLOT were audio and video recorded.

29.    On June 19, 2019, Officer CONWAY and other law enforcement met CS-3. The purpose of this meeting was to conduct a controlled purchase of cocaine from MARTINEZ-PELLOT. At 12:00 p.m., a recorded phone call was placed to MARTINEZ-PELLOT at (262) 770-9667. MARTINEZ-PELLOT stated that he had to pick up the cocaine before he met CS-3. At 12:05 p.m., Law enforcement conducted surveillance at 9711 West Greenwood Terrace. During surveillance, Officer Don Krenzien observed MARTINEZ-PELLOT exit 9711 West Greenwood and enter his red Chevrolet truck (Wisconsin plate: NR6908). Law enforcement officers surveilled MARTINEZ-PELLOT as he drove to 2730 South 10th Street, the address of Hector Yamil RODRIGUEZ-RODRIGUEZ. At about 1:42 p.m., both CS-3 and MARTINEZ-PELLOT met at the Taco Bell. In exchange for $2,200.00, MARTINEZ-PELLOT provided CS-3 with one large bag containing suspected cocaine. CS-3 turned over the suspected cocaine to a law enforcement officer who subjected a sample of it to a field test which yielded a positive result for cocaine, weighing approximately 55.77 grams.

30.    On July 2, 2019, Officer Conway and other law enforcement officers met CS-3. The purpose of this meeting was to conduct a controlled purchase of cocaine from MARTINEZ-PELLOT. At approximately 12:44 p.m., CS-3 received a phone call from MARTINEZ-PELLOT from the cell number of (262) 770-9667. The phone call was prompted by a previous call between CS-3 and MARTINEZ-PELLOT who had made a request to purchase cocaine. MARTINEZ-PELLOT asked for CS-3's location and MARTINEZ-PELLOT stated that he was ready to meet [had cocaine on his person to sell CS-3]. Both agreed to meet at the same Taco Bell located at 5751 West Fond du Lac Avenue in Milwaukee. In exchange for $2,200.00 in U.S. currency provided by law enforcement, MARTINEZ-PELLOT gave CS-3 two vacuum sealed bags that contained suspected cocaine. The suspected cocaine was provided to a law enforcement officer who subjected a sample of it to a field test. The test provided a positive result for cocaine, and weighed approximately 56.14 grams.

31.    On July 18, 2019, Officer Conway and other law enforcement met with CS-3. The purpose of this meeting was to conduct a controlled purchase of cocaine from

MARTINEZ-PELLOT. At 10:42 a.m., law enforcement met CS-3. CS-3 had prior contact with MARTINEZ-PELLOT who agreed to sell cocaine to CS-3 at the Taco Bell located at 5751 West Fond du Lac Avenue, Milwaukee, WI. At 11:23 a.m., CS-3 met MARTINEZ-PELLOT at National Muffler. In exchange for $2,200.00 in U.S. currency provided by law enforcement, MARTINEZ-PELLOT gave CS-3 two plastic bags containing suspected cocaine. The suspected cocaine was given to a law enforcement officer who subjected it to a field test. The test provided a positive result for the presence of cocaine, and weighed approximately 55.89 grams.

### Interception of Wire and Electronic Communication

32.     During this investigation, law enforcement realized that although some normal investigative procedures were successful, other procedures have been tried and failed, reasonably appear unlikely to succeed in achieving all the objectives of this investigation, or were too dangerous to employ. Therefore, in order to identify the organization's source(s) of supply at the highest-level possible and to identify unknown coconspirators and to disrupt dismantle this organization's drug-distribution network both in Milwaukee, Puerto Rico and/or elsewhere, it was necessary to seek authorization to intercept wire and electronic communication on members of this organization. The information below reflects the series of authorized interception orders as this case progressed.

33.     The first order for interception was authorized on June 20, 2019 for a TARGET TELEPHONE-1 found to be utilized by Eric ROSA. Since the first order, there has been a total of fourteen (14) Target Telephones in which interceptions of oral and/or electronic communication were judicially authorized.

34.     On September 6, 2019, at 3:52 p.m., MARTINEZ-PELLOT and Hector Yamil RODRIGUEZ-RODRIGUEZ spoke by phone. MARTINEZ-PELLOT wanted to purchase a quantity of cocaine. Specifically MARTINEZ-PELLOT asked, "Listen, is there something?" RODRIGUEZ-RODRIGUEZ responded, "Dude, two and a half in my hand." MARTINEZ-PELLOT asked, "Oh, you only have 2½ left? Then asked, "Are they solid or…" RODRIGUEZ-RODRIGUEZ replied, "No, they are solid." MARTINEZ-

PELLOT asked, "When can I go get them? Right now?" RODRIGUEZ-RODRIGUEZ replied, "Well, give me some time. I'm going to go get a haircut. Can you do it at around 7:00 p.m.?" MARTINEZ-PELLOT stated, "Yes." Based on their training, experience, and familiarity with this investigation, case agents believe MARTINEZ-PELLOT requested to purchase two and a half kilograms of cocaine. When MARTINEZ-PELLOT asked if they are "solid," he referred to whole kilograms of cocaine, unadulterated by any other means, with "2 ½" the remaining quantity of cocaine which MARTINEZ-POLLOT requested from RODRIGUEZ-RODRIGUEZ. I also know that MARTINEZ-PELLOT is a kilogram quantity purchaser.

        a.     At 10:03 p.m., MARTINEZ-PELLOT texted from (262) 770-9667 to RODRIGUEZ-RODRIGUEZ, "Blood if you can get me that, I need it"

        b.     On September 7, 2019, at 3:50 p.m., RODRIGUEZ-RODRIGUEZ called MARTINEZ-PELLOT at cellular phone number (262) 770-9667. RODRIGUEZ-RODRIGUEZ informed MARTINEZ-PELLOT that he had just woken up and was at his "lady's house." RODRIGUEZ-RODRIGUEZ added, "Give me a few minutes to get ready and everything and I'll call you so you can head to the house." MARTINEZ-PELLOT replied, "I lost a lot of sales today and people call me nonstop when I don't have anything. I lose the money." RODRIGUEZ-RODRIGUEZ replied, "That's how it always works. Give me a few minutes because I just got up. I'm at my lady's house." MARTINEZ-PELLOT replied, "Okay. Don't leave me hanging because I have a lot of people waiting."

        c.     At 5:12 p.m., RODRIGUEZ-RODRIGUEZ called MARTINEZ-PELLOT at (262) 770-9667 and stated, "Come over here." MARTINEZ-PELLOT responded, "On my way over there, faggot."

        d.     At 6:35 p.m., MARTINEZ-PELLOT called RODRIGUEZ-RODRIGUEZ and advised, "I am in the back, blood." RODRIGUEZ-RODRIGUEZ instructed, "Come through the door." At the time of this phone call, RODRIGUEZ-RODRIGUEZ' cellular phone registered to the cellular tower servicing the area of 2730 South 10th Street, Milwaukee, Wisconsin. Based upon my training, experience, and familiarity of this investigation, I believe that MARTINEZ-PELLOT and RODRIGUEZ-

RODRIGUEZ executed a 2.5 kilogram of cocaine deal and that it occurred at 2730 South 10th Street.

35.     On October 7, 2019, at 5:16 p.m., MARTINEZ-PELLOT and Hector Yamil RODRIGUEZ-RODRIGUEZ spoke by telephone with MARTINEZ-PELLOT utilizing cellular phone number (262) 770-9667.[2] RODRIGUEZ-RODRIGUEZ stated, "…whole one and there's a half." MARTINEZ-PELLOT replied, "Half? Okay." RODRIGUEZ-RODRIGUEZ replied, "Yes, half because they arrived Wednesday." MARTINEZ-PELLOT stated, "Okay, what was I going to tell you? How much? The same?" RODRIGUEZ-RODRIGUEZ answered, "Yes, man." MARTINEZ-PELLOT responded, "Go ahead. Let me see what these people want to do."

        a.     At 5:21 p.m., MARTINEZ-PELLOT asked, "What is the half that you have left?" RODRIGUEZ-RODRIGUEZ replied, "From a whole… I just sold half." MARTINEZ-PELLOT inquired about the price and RODRIGUEZ-RODRIGUEZ stated, "Fifteen and a half." RODRIGUEZ-RODRIGUEZ added, "Yes, I will give it to you for fifteen and a half, he can screw himself. I will have commotion over here, but go ahead. That belongs to me and my friend. Go ahead." MARTINEZ-PELLOT remarked, "I will go get the money at the house and will head over there." Prior to ending the call, RODRIGUEZ-RODRIGUEZ advised that on, "Wednesday six more will arrive." MARTINEZ-PELLOT asked if RODRIGUEZ-RODRIGUEZ would give him one of the Wednesday arrivals. RODRIGUEZ-RODRIGUEZ stated, "Yes, six will arrive Wednesday and they're mine. Yes, we can work. Go ahead. You know it." MARTINEZ-PELLOT replied, "Let me see about this work. Save them for me I will look." Based upon their training, experience and familiarity with the investigation, case agents know that MARTINEZ-PELLOT asked the price for half a kilogram and RODRIGUEZ-RODRIGUEZ agreed to sell it to MARTINEZ-PELLOT at a good price, $15,500, instead of the usual price. RODRIGUEZ-RODRIGUEZ indicated that there would be problems ("I will have commotion here"), but RODRIGUEZ-RODRIUEZ didn't care ("he

[2] **MARTINEZ-PELLOT** utilized (262) 770-9667 for all intercepted communications.

14

[GONZALEZ-COLLADA] can screw himself").

b. At 7:07 p.m., MARTINEZ-PELLOT texted RODRIGUEZ-RODRIGUEZ, "I am here." At the time of this interception, RODRIGUEZ-RODRIGUEZ' cellular phone was registering to the cellular tower servicing the area of 2730 South 10th Street.

c. An examination of USPS parcel records indicated that five USPS Priority mail parcels were shipped between the dates of October 7, 2019 and October 8, 2019 from Puerto Rico to Milwaukee, Wisconsin to addresses associated with this DTO.

36. On November 29, 2019, at 2:57 p.m., MARTINEZ-PELLOT and Hector Yamil RODRIGUEZ-RODRIGUEZ spoke by telephone with MARTINEZ-PELLOT utilizing cellular phone number (262) 770-9667. RODRIGUEZ-RODRIGUEZ stated, "Dude, we are active again." MARTINEZ-PELLOT responded, "Oh, thank God." RODRIGUEZ-RODRIGUEZ replied, "… Call me, I have something for you here, something arrived today." Based upon their training, experience, and familiarity with this investigation, case agents believe the DTO received kilogram(s) of cocaine through USPS Priority mail and RODRIGUEZ-RODRIGUEZ set up a future transaction with MARTINEZ-PELLOT.

### Surveillance at N88 W14822 Main Street

37. On December 9, 2019, at approximately 2:10 p.m., Officer Conway conducted a spot check at National Muffler, 5740 W. Fond du Lac Avenue, and located a black Ford Taurus bearing a temporary Wisconsin license plate of S9562H. CS-3 advised Officer Conway that this vehicle is driven by MARTINEZ-PELLOT.

38. On December 17, 2019, at approximately 9:07 a.m., Officer Conway observed the black Ford Taurus with the same temporary license plate parked in the rear of **N88 W14822 Main Street, Menomonee Falls, Wisconsin**. Officer Conway also observed the red Chevrolet truck used by MARTINEZ-PELLOT from the controlled purchase of cocaine on June 19, 2019 parked in the same area. Officer Conway contacted the apartment complex manager and requested a tenant list for **N88 W14822 Main Street.**

The property manager stated they would freely provide him with a tenant list at a later date.

39. On December 18, 2019, at approximately 2:30 p.m., Officer Conway conducted a spot check of **N88 W14822 Main Street** and again observed the black Ford Taurus parked in the same parking spot as observed in the day prior. The Taurus was now bearing Wisconsin license plate AGY2703. A check with the Wisconsin Department of Transportation records revealed that the vehicle was registered to Andros R. MARTINEZ-PELLOT with an address of 5055 N. 58th Street, Milwaukee, Wisconsin. On this same date, Officer Conway was contacted by the apartment complex manager who provided him with the tenant list of individuals staying at **N88 W14822 Main Street.** Andros Martinez is listed as the tenant for **apartment number "B03."**

40. On December 19, 2019, at approximately 1:40 p.m., Officer Conway conducted a spot check of **N88 W14822 Main Street** and again observed MARTINEZ-PELLOT's black Ford Taurus parked in the rear of the complex.

## CANINE HANDLER AND CANINE TRAINING AND EXPERIENCE

41. I know Police Officer (PO) Christopher CONWAY of the Milwaukee Police Department's High Intensity Drug Trafficking Area (HIDTA) Interdiction Unit is the current handler of the Drug Detection Canine "FLEXY," and that Police Officer Christopher CONWAY and "FLEXY" have received four weeks (200 hours) of intensive training and certification through Shallow Creek Kennels, deploying and utilizing a drug detection canine; that this certification is based on guidelines set forth by the North American Police Work Dog Association (NAPWDA) which is a nationally based group in partnership with local, state, federal and international agencies including private vendors, law enforcement and first responder; that this training establishes consensus-based best practices for the use of detection canine teams by improving the consistency and performance of deployed teams which will improve interdiction efforts as well as courtroom acceptance.

42. Officer Conway has explained to Inspector Fink that Shallow Creek Kennels utilizes independent evaluators to certify each drug detection canine team; that these

16

evaluators that certified Drug Detection Canine "FLEXY" have been certifying drug detection canines since the year 2004; that the first evaluator and owner is John Brannon. John Brannon's career in Law Enforcement spans a 24 year period with 22 years having been spent as a K9 officer working 5 dual purpose Police Service Dogs. For approximately, 20 years John was employed by the Coral Springs Police Department, Broward County Florida where he was responsible for all the day to day operations of the K9 unit. Additionally, while with Coral Springs, John was an active Special Response Team member and the S.R.T canine team leader. John is a certified State of Florida K9 Instructor since 1993 and is a Florida Department of Law Enforcement Trainer Evaluator. In 2004, John established Shallow Creek Kennels located in Sharpsville, Pennsylvania. Shallow Creek Kennels is an Ohio Peace Officer's Training Academy and Florida Department of Law Enforcement certified training facility. John's professional membership include: Master Trainer for the North American Police Work Dog Association and past President of Pennsylvania Police Work Dog Association.

43. Officer Conway also explained a second evaluator is Jeremy Riley. Riley entered the United States Army, where he served 5 years as a Military Working Dog Handler. During his Military career he worked two dual purpose military working dogs achieving the rank Specialist and was deployed to Korea as well as Bosnia. He then became a police canine handler for the Henderson County Sheriff's Office in North Carolina where he worked 3 dual purpose police service dogs for 11 years. Riley was his agency's unit trainer. Jeremy Riley is also a member of the North American Police Working Dog Association.

44. Officer Conway explained a third evaluator is Mike Van Leer who became a State Certified Canine Instructor for the Florida Highway Patrol in 1993. He then became the first and only current State Certified Evaluator for the Florida Highway Patrol in 1996. He is the first canine trainer/evaluator in the State of Florida qualified to teach and certify narcotic detection canines under a national program, the International Forensic Research Institute at Florida International University. As a canine instructor/evaluator, Trooper Van Leer has trained over 65 police canine teams in the

areas of narcotic detection, tracking and patrol work. Trooper Van Leer has over 2,000 academic hours in the training of Police Working Dogs.

45.    Officer CONWAY is the current handler of the Drug Detection Canine "FLEXY," and that "FLEXY" is trained to detect the odor of controlled substances; that these substances include marijuana, cocaine, heroin, methamphetamine, etc., as well as other dangerous drugs due to chemical processing similarities; that upon location of the odor of these controlled substances, the dog's behavior will change; that the dog is trained to come to a final indication or response of a sit at the source of the odor; that this final indication or response is called an "Alert;" furthermore, this final indication or response or "Alert" may also indicate items recently contaminated with, or associated with, the odor of one or more of the controlled substances.

46.    According to Officer CONWAY, the current handler of the Drug Detection Canine "FLEXY," when a dog is trained to detect a substance that it learns to discriminate the odor vapor of that substance from other odors in the environment by reacting to the compound(s) that best help it earn reinforcement from the drug detection canine handler; that with sufficient training, the compound(s) whose detection most often results in reinforcement becomes the "odor detection signature."

47.    According to Officer CONWAY, that his Drug Detection Canine "FLEXY" has detected controlled substances more than "300" times in the past which included training; that in each alert drugs that "FLEXY" is trained to find have been recovered or a drug nexus has been found; that "FLEXY" alerts have been the basis for more than (20) search warrants and the search of motor vehicles; that in each alert, drugs that "FLEXY" is trained to find have been recovered or a drug nexus has been found; that the canine has been used in these motor vehicle searches during training and in the execution of search warrants in the past and that during these searches the canine has located controlled substances for the officers resulting in the arrest and issuance of charges pending against these individuals.

48.    Based on the above information, there is probable cause to believe that the items described in Attachment B, which are evidence of violations of Title 21, U.S.C.

Sections 841 and 846, as well as contraband, fruits of a crime, or other items illegally possessed are located at **N88 W14822 Main Street, Apartment B-3, Menomonee Falls, Wisconsin**, and therefore requests that this court issue a warrant to search **N88 W14822 Main Street, Apartment B03, Menomonee Falls, Wisconsin** and to seize the items specified in Attachment B.

## ATTACHMENT A
### *Location to be Searched*

**N88 W14822 Main Street, Menomonee Falls, Wisconsin**, is an apartment complex located on Main Street on the north side of the street. The building is a light colored two-story building with a partial stone facade. The numerals "N88 W14822" are located on the southern wall of the complex. A "B-3" placard is affixed directly on the entry door to the apartment. The apartment is located on the first floor.





## ATTACHMENT B
### *Items To Be Searched*

A. The odor vapor of the following controlled substances which can be detected by the drug detecting K-9, emanating from the target address.

   1. The odor of Marijuana – a greenish plant like substance
   2. The odor of cocaine – a white, powdery or off-white chunky substance
   3. The odor of heroin – a tan or grey, chunky and/or powdery substance
   4. The odor of fentanyl – a white, powdered or chunky substance
   5. The odor of methamphetamine – a clear or off-white substance with a "glass-like" appearance.

B. This warrant does not authorize the seizure of any tangible property.

Case 2:20-mj-00801-WEC   Filed 01/30/20   Page 22 of 22   Document 1